While I concur in the decision of the majority to grant a limited writ of mandamus and to remand this matter to the Industrial Commission to issue a new order, I do so for the further reason that the commission's order violates State ex rel. Zamora v. Indus. Comm. (1989),45 Ohio St.3d 17. As stated by the majority, relator was examined by Dr. Schubert in 1994, who concluded that relator did not suffer from dysthymia. In 1997, the commission awarded relator 65 percent permanent partial disability for the allowed conditions of his claim, which included dysthymia, thus rejecting the conclusions in the report of Dr. Schubert. Having rejected the report of Dr. Schubert once, the commission cannot now rely on this same report to deny permanent total disability compensation for the same condition.
 APPENDIX A IN MANDAMUS
In this original action, relator, Richard Lampley, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation and to enter an order granting said compensation.
Findings of Fact:
1. On September 14, 1983, relator sustained an industrial injury while employed as a "spot welder" for respondent General Motors Corporation ("General Motors") at its Lordstown assembly plant. General Motors is a self-insured employer under Ohio's workers' compensation laws. On that date, relator slipped and fell on some oil that was on a quarter panel rack that he was walking across. The industrial claim is allowed for: "[c]erebral concussion, acute cervical strain, tendonitis left wrist, left shoulder, lumbosacral strain, dysthymia," and is assigned claim number 825415-22. The claim is disallowed for: "[m]ajor depression."
2. Relator filed applications for PTD compensation on July 18, 1989 and May 2, 1995.
3. On April 11, 1990, relator was examined by psychologist Steven V. Van Auken, Ph.D., for an evaluation of his allowed dysthymia. Dr. Van Auken reported:
 * * * His condition, here diagnosed as Dysthymic Disorder, is characterized also by anxiety and agitation. In and of itself, the psychiatric component of his condition would not prevent him from returning to his former position of employment. The psychiatric condition is tied intimately to the physical condition. The psychiatric condition does now present as permanent, in the sense that there has been no sign of alleviation, and it would be likely to continue for an indefinite period of time, without present sign of recovery. The psychiatric condition would not in itself prohibit him from engaging in any sustained remunerative employment. The condition presents as permanent and partial, in the amount of approximately thirty percent of the body as a whole. * * *
4. On October 3, 1994, relator was examined by Satish Mahna, M.D. Dr. Mahna did not examine for the dysthymia. Dr. Mahna reported:
 * * * Mr. Lampley's diagnoses included chronic recurrent headaches, most probably of vascular origin and unrelated to the occupational injury under consideration; resolved cervical and lumbosacral strain; resolved tendonitis of the left wrist and left shoulder * * *.
* * *
 * * * Mr. Lampley is not permanently and totally disabled or unfit for sustained remunerative employment. No specific restrictions need to be imposed because of the work injury and allowed conditions in this claim. On the other hand, considering the general deconditioning and ongoing symptoms, I am of the opinion that he is capable of sedentary to light work only at this point. As he gets acclimatized to his work, the restrictions may be modified or lifted altogether.
 * * * Based upon subjective symptoms and objective findings, Mr. Lampley has 15% impairment of the whole person due to allowed (physical portion) conditions in this claim.
5. On October 19, 1994, relator was examined on behalf of General Motors by psychiatrist Daniel Schubert, M.D., Ph.D. Dr. Schubert reported:
 He does not meet criteria for dysthymia now. I do not find that he meets criteria for any psychiatric condition and diagnosis at this time.
* * *
 He is not permanently and totally disabled as a result of dysthymia because he does not have dysthymia.
 On the basis of his current psychiatric evaluation, he would be able to engage in sustained remunerative employment. [Emphasis sic.]
6. On August 10, 1995, relator was examined by psychologist Robert L. Byrnes, Ph.D., on behalf of the commission. Dr. Byrnes reported:
 Mr. Lampley is a 52-year-old man who reports a significant history of work injury, pain and depression. Prior to his injury he had gone through some very stressful periods in his life. After he lost his first wife it appears that working was always very important to him. Since his injury on 09/14/83, he has become very preoccupied with his physical problems. He ruminates alot about the Workers' Compensation system. He worries about not being able to do things like care for his house. He has faced other problems which have developed secondarily, such as financial problems. His pain has likely contributed to his becoming depressed and his depression probably exacerbates his pain. His personal resources and coping skills do not appear to have been sufficient to allow him to cope with his situation and he has developed some pretty significant mental symptoms. At this point in time he is angry and depressed, and socially withdrawn. His adaptive capacity is strained. His overall clinical picture is consistent with the following DSM-IV diagnosis:
AXIS I: 300.4 Dysthymic Disorder
 307.89 Pain Disorder Associated with both Psychological Factors and a General Medical Condition
AXIS II: 799.9 Diagnosis Deferred on Axis II
 OPINION It is my opinion that Mr. Lampley is not currently able to resume his former position of employment as a spot welder. Both physical and psychological factors would appear to be limiting in this regard.
 This patient's current anger and depression coupled with his limited adaptive capacity and current limited interpersonal ability would significantly limit his ability to work productively.
 According to the AMA Guides to the Evaluation of Permanent Impairment III, I find this claimant's impairment to be marked and I assign a 60% whole person impairment for his allowed mental condition only.
 This patient would have difficulty in any occupation which required much focused attention, adaptive capacity or ability to function interpersonally. He would have great difficulty adapting to stress.
 It appears that this patient's treatment to date has been appropriate, and likely without treatment, his condition would be much worse.
 It appears that this patient has reached maximum medical improvement in the sense that his mental condition appears to be well stabilized at his current functional level.
7. On August 31, 1995, relator was examined on the commission's behalf by neurologist, Jon L. Weingart, M.D., who reported:
 EXAMINATION: The neurologic examination, as referrable to the concussion and the cervical strain, was normal. There were no reflex abnormalities nor were there abnormalities of cranial nerve function nor of motor function.
 OPINION: It is my opinion that the claimant is NOT able to return to his former position of employment because of his chronic pain problem. [Emphasis sic.]
8. On September 1, 1995, relator was examined on the commission's behalf by orthopedic surgeon, Paul A. Steurer, M.D. Dr. Steurer completed a "work capacities" form on which he indicates that relator could perform sedentary and light work.
9. Following an October 30, 1995 hearing, two staff hearing officers issued an order denying the PTD applications filed July 18, 1989 and May 2, 1995. The order states that it "is based particularly upon the reports of Drs. Mahna, Schubert, Van Auken, Weingard [sic], and Steurer."
10. In 1996, relator filed in this court a mandamus action challenging the commission's October 30, 1995 order. The mandamus action, which was assigned case No. 96AP-525, resulted in the parties filing of a Civ.R. 41(A) stipulation of dismissal on November 4, 1996, pursuant to a written agreement between the parties. The commission agreed to vacate its October 30, 1995 order, and to schedule a de novo hearing to redetermine the merits of the PTD applications.
11. Pursuant to the agreement of the parties in case No. 96AP-525, the commission entered an order in March 1997, that vacated the commission's order of October 30, 1995, and provided for the scheduling of a hearing on the applications.
12. In the meantime, on November 28, 1995, relator filed an application for the determination of the percentage of permanent partial disability.
13. On April 15, 1997, a district hearing officer ("DHO") heard objections to a tentative order awarding R.C. 4123.57 permanent partial disability compensation to relator. The DHO's order of April 15, 1997, awarded relator sixty-five percent permanent partial disability. The order states:
 The reports of Dr(s). Bartos, Brynes [sic], VanAuken [sic], Mahna, Steurer, were reviewed and evaluated. This order is based upon the report of Dr(s). Bartos, Brynes [sic], VanAuken [sic], Mahna, Steurer.
14. Apparently, no application for reconsideration under R.C. 4123.57
was filed. Thus, the DHO's order of April 15, 1997, awarding relator sixty-five percent permanent partial disability became the commission's final order on the application for permanent partial disability compensation.
15. On December 17, 1998, a Staff Hearing Officer ("SHO") heard the two PTD applications. Following the hearing, the SHO issued an order that again denied the PTD applications. The SHO's order states:
 The Claimant was injured on September 14, 1983 when hew [sic] was walking across a quarter panel rack and fell after stepping in oil. To date the Claimant has received conservative care in the form of physical therapy and medications for the allowed physical conditions in this claim. This claim has also been allowed for dysthymia, for which the Claimant takes medication and received psychotherapy.
 Despite all treatment the Claimant has received he has not returned to work since the date of his injury. At the present time he asserts that the allowed conditions herein prevent him from returning to all sustained remunerative employ-ment.
 Based upon the report of Dr. Mahna who examined the Claimant at the Employer's request on October 10, 1994 and the report of Dr. Steurer who examined the Claimant at the Commission's request on August 10, 1995, the Staff Hearing Officer finds that the Claimant is physically capable of engaging in sedentary to light work activities. According to Dr. Mahna the Claimant should be allowed to sit and stand intermittently. The Claimant should avoid frequent stooping, twisting, exposure to whole body vibrations, pushing and pulling of heavy objects.
 According to Dr. Steurer the Claimant's work activities could involve driving a standard shift auto for up to three hours, repetitive use of his hands for single grasping and fine manipulation as well as occasional bending, climbing, crawling and squatting.
 The Staff Hearing Officer [h]as relied on the report of the Employer's psychiatrist, Dr. Shubert [sic], in making her determination of the Claimant's impairment due to the dysthymia, Dr. Shubert [sic] opined that the Claimant is not permanently and totally disabled due to the dysthymia because he does not have dysthymia at this time. He goes on to state that he did not find the Claimant to be suffering from any psychiatric condition at the time he examined him.
 Based upon the fact that Dr. Shubert [sic] found no psychiatric condition existed at the present time, the Staff Hearing [O]fficer interprets his statement, "the Claimant can return to sustained remunerative employment" to mean that the Claimant could return to any and all work because he has no psychiatric impairment.
 When considering the medical impairment only the Staff Hearing Officer finds that the Claimant retains the ability to engage in sustained remunerative employment, therefore, the non-medical disability factors must also be considered.
 The Claimant's permanent total disability application reveals that he is a fifty-five year old high school graduate. After leaving high school he entered the military. He was employed by General Motors Corp. from 1962 to 1983.
 According to the Claimant's permanent total disability application he is able to read, write and do basic math. The Staff Hearing Officer assumes that the Claimant reads, writes and does basic math at the twelfth grade level as there is no evidence in the file to the contrary. In addition the Claimant does not state that he has any deficits with respect to his ability to read, write and do basic math. Based upon the foregoing facts the Hearing Officer finds the Claimant's education is a positive vocational factor because it would adequately enable him to do entry level sedentary and light jobs. Further, the fact that the Claimant was able to complete high school without difficulty leads the Hearing Officer to believe that he would be [able] to complete a retraining program if retraining were necessary for re-employment.
 This is a reconstructed file, therefore it contains less than a complete history of the skills the Claimant used in his past employment. The Permanent and Total Disability Application indicates that the Claimant was a heavy equipment operator in the military and he was an assembler for General Motors Corp. Considering the aforementioned jobs the Hearing Officer is unable to find that the Claimant acquired any skills that would be directly transferable to light or sedentary work. However, transferable skills are not the only benefit derived from employment.
 In this case the Claimant was able to maintain employment for twenty years which is evidence of his ability to work with others, follow instructions and complete assigned tasks. All of the aforementioned worker traits would logically be of value to potential employers. Based upon the foregoing facts the Staff Hearing Officer finds that the Claimant's long term past employment is a positive vocational factor.
 Lastly, consideration must be given to the Claimant's age. Age in and of itself is not work prohibitive but it can impair or preclude the claimant's employment if it adversely effects his ability to do work in competitions with others. In this case there is no indication that the claimant's age of fifty-five has any adverse effect on his ability to obtain and maintain light duty or sedentary work, therefore his age is a neutral factor.
 Since the Claimant retains the ability to engage in the work activity, he is not permanently and totally disabled. The Staff Hearing Officer has arrived at this conclusion because none of the aforementioned vocational factors considered alone or in combination with other factors prevent the Claimant from engaging in work activity within his physical restrictions.
16. On October 29, 2001, relator, Richard Lampley, filed this mandamus action.
Conclusions of Law:
Two issues are presented: (1) whether the principle set forth in State ex rel. Zamora v. Indus. Comm. (1989), 45 Ohio St.3d 17, and its progeny, required the commission to eliminate the October 19, 1994 report of Dr. Schubert from evidentiary consideration in determining relator's PTD applications; and (2) whether Dr. Schubert's finding that relator does not have dysthymia required the commission to eliminate his report from evidentiary consideration.
The magistrate finds: (1) the Zamora rule did not require the commission to eliminate Dr. Schubert's report from evidentiary consideration; and (2) Dr. Schubert's finding that relator does not have dysthymia did not require the commission to eliminate the report from evidentiary consideration. Accordingly, as more fully explained below, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
Zamora prohibits the commission from relying on a medical report that the commission had earlier found unpersuasive. State ex rel. Jeep Corp. v. Indus. Comm. (1992), 64 Ohio St.3d 378, 381.
The Jeep court summarized Zamora, stating:
 * * * In Zamora, the claimant simultaneously applied to have an additional psychiatric allowance and to have himself declared permanently totally disabled. The claimant was examined by various specialists, including Dr. Dennis W. Kogut, who stated that the claimant's depression preceded his industrial injury and that the contribution of the industrial injury to the depression was minimal.
 The commission allowed the psychiatric condition and, in so doing, implicitly rejected Kogut's report. However, ten months later, the commission denied the application for permanent total disability based partially on Dr. Kogut's same narrative. The claimant challenged the commission's subsequent reliance on that report, arguing that once rejected, the report was removed from evidentiary consideration. We agreed.
The Zamora rule has been subsequently clarified by further case law.
In State ex rel. Domjancic v. Indus. Comm. (1994), 69 Ohio St.3d 693, the claimant's PTD application prompted the commission to have claimant examined by orthopedist Dr. Gonzalez who issued a report prior to the hearing. At the hearing, the PTD application was held in abeyance until the commission could obtain a further medical report from Dr. Baroff. Thereafter, the commission denied the PTD application based in part upon the report of Dr. Gonzalez. In the mandamus action that followed, the claimant argued that the commission inherently rejected Dr. Gonzalez's report by ordering a later examination by Dr. Baroff. The Domjancic court rejected the argument stating:
 The "implicit rejection" concept articulated in State ex rel. Zamora v. Indus. Comm. (1989), 45 Ohio St.3d 17
* * *, applies where the commission makes a finding that is necessarily premised on a rejection of a given doctor's conclusion. Once the commission has done so, it cannot revive that report as evidence supporting a later finding.
 No finding or order arose between the dates of the Gonzalez and Baroff reports, distinguishing this case from Zamora. Equally important, the commission's prerogative to determine that further medical evidence is needed must not amount to a merit adjudication of other medical reports already in file. To so hold forces the commission to forgo obtaining further medical opinions if it desires to use previously submitted evidence as well. * * * [Id. at 696.]
In State ex rel. Dayton Walther Corp. v. Indus. Comm. (1994),71 Ohio St.3d 105, 106, the commission had granted PTD compensation on December 19, 1990, in a standard boiler-plate order, stating:
 "* * * The reports of Doctors Dinkin, Louis, Patil, Dillahunt and Burton were reviewed and evaluated. This order is based particularly upon the reports [sic] of Doctor Burton * * *."
Subsequently, in the Dayton Walther case, the commission's December 19, 1990 order was vacated by this court pursuant to State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203. During the pendency of this court's decision, two commissioners who attended the December 19, 1990 hearing were replaced. On September 11, 1991, the new commission reheard the PTD application and again granted PTD compensation, writing:
 "* * * The medical reports of Drs. Dinkin, Louis, Patil, Dillahunt, Wiltse and Burton were reviewed and evaluated. This finding and award was based particularly upon the reports of Drs. Dinkin, Patil and Dillahunt.["] [Dayton Walther at 106.]
The Dayton Walther court stated:
 Walther also challenges the medical evidence on which the commission relied. The reports of Drs. Dinkin, Louis, Patil, Dillahunt and Burton were before the commission at the initial hearing. The permanent total disability award that resulted was "based particularly" upon Dr. Burton's report. Confronted with the same evidence at the second hearing, the commission chose to rely instead on the reports of Drs. Dinkin, Patil and Dillahunt.
 Walther argues that in originally relying on Dr. Burton's report, the commission inherently rejected the other medical reports in evidence. Citing State ex rel. Zamora v. Indus. Comm. (1988), 45 Ohio St.3d 17 * * *, Walther argues that such inherent rejection precluded the commission from relying on those reports later.
 This position, however, ignores the changes in commission membership that preceded and precipitated the second hearing. Walther's argument, if adopted, would deprive some commissioners, but not others, of the ability to consider all evidence relevant to claimant's permanent total disability application. This result is unacceptable. [Id. at 107-108.]
In State ex rel. Tilley v. Indus. Comm. (1997), 78 Ohio St.3d 524, the claimant's employer, Mount Carmel Medical Center ("Mount Carmel") moved to terminate temporary total disability compensation based upon the report of Dr. Fallon who found that the claimant had reached maximum medical improvement. The commission granted Mount Carmel's motion based upon Dr. Fallon's report. The claimant filed a mandamus action in this court to challenge the commission's termination of her temporary total disability compensation.
The claimant in Tilley argued that because Dr. Fallon had examined her before a degenerative disc disease ("DDD") condition was additionally allowed, that condition was not considered in his permanency assessment. This court agreed, vacated the order, and returned the matter for further consideration and an amended order. Mount Carmel appealed as of right to the Ohio Supreme Court.
The Tilley court wrote:
 Mt. Carmel lastly asserts that disqualification of Fallon's report violates Zamora. This argument fails as well. * * *
* * *
 Mt. Carmel attempts to equate this case with Zamora. It notes that the commission had earlier relied on Fallon's report when it allowed the DDD condition. Mt. Carmel contends that to hold the commission cannot rely on Fallon now would create the kind of inconsistency that Zamora prohibits. This contention lacks merit.
 The relevant chronology in this case renders Zamora inapplicable. Zamora is properly invoked when the commission tries to revive evidence that was previously deemed unpersuasive. Thus, unless rejection preceded reliance, Zamora does not apply. Here, the commission's initial encounter with Fallon's report generated reliance on that report, not rejection. Revival is not an issue. [Id. at 528.]
In this action, relator argues that the commission implicitly rejected Dr. Schubert's report when it awarded relator sixty-five percent permanent partial disability based upon the reports of Drs. Bartos, Byrnes, Van Auken, Mahna, and Steurer.
Relator points out that following an April 11, 1990 examination, psychologist Van Auken found that relator's dysthymia condition presented a thirty percent permanent partial disability. Following an August 10, 1995 examination, commission psychiatrist Dr. Byrnes assessed a sixty percent whole person impairment for the dysthymia condition. In sharp contrast, following an October 19, 1994 examination, Dr. Schubert found that relator "does not meet criteria for dysthymia now" and "he does not have dysthymia."
According to relator, under Zamora, commission reliance upon the reports of Drs. Byrnes and Van Auken (who respectively found a sixty percent and thirty percent permanent partial disability based upon the dysthymia), must be viewed as an implicit rejection of Dr. Schubert's opinion that relator does not have dysthymia. The magistrate disagrees.
To begin, the DHO's order of April 15, 1997, specifically lists the reports considered. Dr. Schubert's report is not among the reports listed. This is under-standable. Dr. Schubert did not examine relator for permanent partial disability. Thus, there was no reason for the commission to consider Dr. Schubert's report in connection with relator's application for the determination of the percentage of permanent partial disability.
In the magistrate's view, under Zamora, it cannot be said that the commission implicitly rejected a report when the order at issue specifically indicates that it was not among the reports considered and when there is no other evidence indicating that the commission must have considered the report despite the listing of the reports in the order.
Relator's argument under Zamora seems to suggest that Zamora requires this court to determine whether it is inconsistent in some respect for the commission to rely on Dr. Schubert's report to deny the PTD application when it had previously awarded permanent partial disability based upon the reports of Drs. Van Auken and Byrnes. The magistrate disagrees with relator's suggestion that Zamora requires this court to analyze the orders relating to permanent partial disability and permanent total disability for an alleged inconsistency over the dysthymia condition. Tilley makes it clear that Zamora is not a broad based rule to achieve some perceived consistency among commission orders generated in an industrial claim. As Tilley indicates, the Zamora rule simply prohibits commission revival of evidence previously rejected.
Thus, the magistrate finds that the "implicit rejection" concept of Zamora did not prohibit commission reliance upon Dr. Schubert's report.
The magistrate recognizes that, here, the commission has conceded that its reliance upon Dr. Schubert's report is improper. In its brief, the commission writes:
 * * * [I]t was inconsistent to issue a final order finding that Lampley suffers from a permanent mental condition (dysthymia) for purposes of a permanent partial disability award and then later deny Lampley PTD based on a report stating that Lampley does not suffer from this same mental condition. [Resp. commission's brief at 5.]
Presumably, the commission's concession is premised upon its own analysis of Zamora and its progeny, even though Zamora is not cited in the commission's brief.
Here, in conceding error, the commission simply explains that it was "inconsistent" for it to award permanent partial disability as it did and to deny PTD compensation as it did.
As previously noted, Zamora does not require the commission or the courts to achieve some perceived consistency among commission orders generated in an industrial claim. Accordingly, the commission's position here is incorrect and, thus, does not further relator's argument for a writ of mandamus.
The second issue is whether Dr. Schubert's finding that relator does not have dysthymia required the commission to eliminate the report from evidentiary consideration.
According to relator, Dr. Schubert "rejected a condition that had been allowed." (Relator's brief at 7.) Relator also asserts "the Commission relied on a report that was based on a conclusion that had already been rejected by a jury and the Commission." (Relator's brief at 14.) Thus, relator suggests another ground for elimination of Dr. Schubert's report — that Dr. Schubert failed to accept the claim as being allowed for dysthymia. This argument is easily answered by State ex rel. Middlesworth v. Regal Ware, Inc. (2001), 93 Ohio St.3d 214.
In Middlesworth, the claimant challenged in mandamus the commission's denial of his PTD application. The commission had relied upon the report of Dr. Demeter to deny the application. The Middlesworth court stated:
 This controversy centers on Dr. Demeter's conclusion that "[a]t the present time I find no evidence to support the claim of interstitial pulmonary fibrosis with bilateral apical lung disease." The court of appeals interpreted this language as the doctor's refusal to accept the claim's allowed conditions. We disagree. Instead, we find our opinion in State ex rel. Domjancic v. Indus. Comm. (1994), 69 Ohio St.3d 693
* * * to be dispositive.
 In Domjancic, an examining physician noted "[n]o evidence of a herniated disc L4-5 on the right" the claim's allowed condition. That claimant, in turn, offered the very argument that Middlesworth presents. In rejecting that position, the Domjancic court concluded that "Dr. Gonzalez's report, at the outset, outlines all allowed conditions, substantiating his awareness of what the claimant's recognized conditions were. That the doctor, upon examination, found no evidence of a herniated disc, does not amount to a repudiation of the allowance. As the referee insightfully stated:
 "`Dr. Gonzalez was not required to merely parrot the allowed conditions as his medical findings. It was Dr. Gonzalez's duty to report his actual clinical findings. Obviously, the doctrines of res judicata and collateral estoppel do not apply to limit what a doctor may find during his examination.'" (Emphasis sic.) Id. at 695-696 * * *.
 Obviously, Dr. Demeter knew that a pulmonary condition was at issue. He referred to "interstitial lung disease" three times in his report. "Interstitial fibrosis" and "interstitial infiltrates" are also mentioned, and again, the allowance is quoted verbatim in his report. However, according to Dr. Demeter, the condition no longer existed. This is not a situation where the doctor acknowledged the condition's existence but refused to accept the commission's prior determination of industrial causal relationship. In this case, it is immaterial whether Dr. Demeter believed that the claim was correctly or incorrectly allowed years ago. What matters is how the condition was affecting claimant's ability to work at the time of the examination, and Dr. Demeter found no impact. Accordingly, the commission, as the sole evaluator of evidentiary weight and credibility, did not abuse its discretion in citing Dr. Demeter's report as "some evidence" of a capacity for sustained remunerative employment. * * * [Id. at 215-216.]
Here, Dr. Schubert clearly indicates in his report that the industrial claim is allowed for "dysthymia." Dr. Schubert evaluated relator for dysthymia but did not find dysthymia. Under such circumstances, Dr. Schubert was required to report his actual findings. Middlesworth, supra. His report cannot be removed from evidentiary con-sideration on grounds that he failed to find clinical evidence of dysthymia. Id.
Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.